IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TONIA TIPPINS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 18-923C |
| v. | ) | Judge David A. Tapp |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

MARTIN F. HOCKEY, JR.
Deputy Director

DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-9303

Attorneys for Defendant

Of Counsel:

BRIAN JUDGE
Chief

LCDR JUSTIN R. JOLLEY
Deputy Chief

Office of Claims & Litigation
United States Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, D.C. 20593-7213

January 29, 2021

## <u>TABLE OF CONTENTS</u>

**Page:**

TABLE OF AUTHORITIES ................................................................................. ii

STATEMENT OF THE ISSUE................................................................................1

STATEMENT OF THE CASE................................................................................2

STATEMENT OF FACTS .....................................................................................2

SUMMARY OF THE ARGUMENT .......................................................................7

ARGUMENT .........................................................................................................9

I.      The Statutory Scheme Broadly Authorizes, But Does Not Define, Reductions In Force ...9

II.     The Secretary's Interpretation Of Section 357(j) Is Consistent With The Plain Meaning And Otherwise Is Entitled To *Chevron* Deference ..........................................................11

        A.      The Secretary's Interpretation Of Section 357(j) Should Be Sustained Based Upon The Plain Meaning Under *Chevron* Step One...................................12

        B.      Even If Section 357(j) Is Ambiguous, The Secretary's Reasonable Interpretation Is Entitled To Deference Under *Chevron* Step Two ......................14

        C.      The Repeal Of Section 357 By Congress Further Supports The Reasonableness Of The Secretary's Interpretation .................................16

III.    Plaintiffs' Remaining Arguments Are Without Merit .......................................17

CONCLUSION....................................................................................................23

# TABLE OF AUTHORITIES

**Cases:**                                                                                                        **Page(s):**

*Allphin v. United States*, 758 F.3d 1336 (Fed. Cir. 2014)................................................7, 9, 13, 21

*Barnes v. GenCorp. Inc.*, 896 F.2d 1457 (6th Cir. 1990) ............................................................20

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)...........................10, 11

*Corus Staal BV v. United States*, 395 F.3d 1343 (Fed. Cir. 2005) ................................................11

*Cross v. Dep't of Transp.*, 127 F.3d 1443 (Fed. Cir. 1997)...........................................12, 13, 14

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ..................11

*Gandola v. Fed. Trade Comm'n*, 773 F.2d 308 (Fed. Cir. 1985) ..................................................18

*Huber v. Merit Sys. Prot. Bd.*, 793 F.2d 284 (1986).........................................................17, 18, 19

*Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016) ......................................................11, 12

*James v. Von Zemenszky*, 284 F.3d 1310 (Fed. Cir. 2002) .......................................................17, 18

*Lippmann v. United States*, 127 Fed. Cl. 238 (2016)..................................................................7, 9

*Meyers v. United States*, 96 Fed. Cl. 34 (2010) ....................................................................... 10-11

*Murphy v. United States*, 993 F.2d 871 (Fed. Cir. 1993)...........................................................14

*Nat'l Federation of Fed. Employees v. Dep't of the Army*, 810 F.3d 1272 (Fed. Cir. 2015) ........13

*Sanders v. Kohler Co.*, 641 F.3d 290 (8th Cir. 2011) ...................................................................20

*Sargisson v. United States*, 913 F.2d 918 (Fed. Cir. 1990)...........................................................14

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ...........17

*Suramerica de Aleaciones Laminades, C.A. v. United States*, 966 F.2d 660 (Fed. Cir. 1992)11, 12

*Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004) ......................................................11

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009).....................................................................11

*Voge v. United States*, 844 F.2d 776 (Fed. Cir. 1988) ................................................................14

*Welch v. Dep't of Army*, 323 F.3d 1042 (Fed. Cir. 2003)...................................................13, 17, 18

*Wolf v. Dep't of Vet. Affairs*, 317 F.3d 1395 (Fed. Cir. 2003)......................................................19

**TABLE OF AUTHORITIES (continued)**

**Statutes:**                                                                               **Page(s):**

5 U.S.C. § 3501 .............................................................................................................15

5 U.S.C. § 3502 ...............................................................................................14, 15, 18

5 U.S.C. § 3595 ...............................................................................................15, 19, 20

5 U.S.C. § 5361 .............................................................................................................15

5 U.S.C. § 5362 .............................................................................................................15

5 U.S.C. § 7511 .............................................................................................................19

5 U.S.C. § 7512 .......................................................................................................15, 18

5 U.S.C. § 7513 .............................................................................................................18

10 U.S.C. § 101 ...............................................................................................................9

10 U.S.C. § 1169 ...................................................................................................6, 9, 22

14 U.S.C. § 357 (2012) ......................................................................................... *passim*

14 U.S.C. § 501 .............................................................................................................10

5 U.S.C. § 861(a) (1964) ...............................................................................................12

5 U.S.C. § 3502(a) (1970) .............................................................................................12

Act of Sept. 6, 1966, Pub. L. 89-554, 80 Stat. 428 (1966) ..........................................12

Coast Guard Authorization Act of 2016, Pub. L. 114-120, 130 Stat. 45 (2016) ..................2, 7, 16

Coast Guard Authorization Act of 1991, Pub. L. 102-241, 105 Stat. 2211 (1991) ........................9

**Legislative History:**

H.R. Rep. No. 89-901 (1965)....................................................................................12, 13

H.R. REP. NO. 102-132 (1991)...........................................................................................10

S. Rep. No. 89-1380 (1966) ....................................................................................... 12-13

S. REP. NO. 102-169 (1991) ...............................................................................................10

S. REP. NO. 114-168 (2015) .......................................................................................... 16-17

**TABLE OF AUTHORITIES (continued)**

**Regulations:**                                                                                              **Page(s):**

5 C.F.R. part 351 ..........................................................................................................15

5 C.F.R. § 351.201 ...........................................................................................14, 15, 16, 19

5 C.F.R. § 351.901 ......................................................................................................14, 18

**Other Authorities:**

Merriam-Webster's Collegiate Dictionary (11th ed. 2005)......................................................12, 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| | ) | |
| TONIA TIPPINS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 18-923C |
| v. | ) | Judge David A. Tapp |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Court's Rules (RCFC), defendant, the United States, respectfully requests that the Court grant this cross-motion for summary judgment and deny the plaintiffs' motion for summary judgment.  In support of this cross-motion and response, we rely upon the accompanying defendant's appendix (DA), which contains (1) defendant's October 9, 2020 interrogatory answers that are verified under penalty of perjury by Coast Guard Rear Admiral Daniel A. Neptun (Ret.), Commander Morgan T. Holden, and Lieutenant Commander Chad M. Conrad (Sworn Interrogatory Answers, DA1-15); (2) excerpts of the administrative record (AR) in this case that was certified under penalty of perjury (DA16-60); and (3) the accompanying sworn declaration of Captain Christopher P. Calhoun (Ret.) (DA61-63).[1]

STATEMENT OF THE ISSUE

When the United States Coast Guard reduced the size of the retirement-eligible enlisted workforce through Active Duty Enlisted Career Retention Screening Panels (CRSPs) in 2012,

---

[1] Pursuant to the Court's orders, we are filing a dispositive cross-motion for summary judgment pursuant to Rule 56, rather than a motion for judgment upon the AR pursuant to Rule 56.2.  Order at 2, July 2, 2019, ECF No. 22; Opinion and Order at 2, Aug. 10, 2020, ECF No. 52. We refer to plaintiffs' motion for summary judgment, ECF No. 62, as "Pls. Mot. for S.J."

2013, and 2014, pursuant to authorization by the Secretary of the Department of Homeland Security (Secretary), was that a reduction in force within the meaning of 14 U.S.C. § 357(j) (2012), such that plaintiffs were not entitled to the enlisted personnel board procedures in 14 U.S.C. § 357(a)-(g) (2012)?[2]

## STATEMENT OF THE CASE

Plaintiffs are former enlisted service members in the United States Coast Guard.  The Coast Guard involuntarily retired plaintiffs during the 2012, 2013, and 2014 CRSPs.  During the CRSP process, the Coast Guard did not use enlisted personnel board procedures set forth in 14 U.S.C. § 357(a)-(g), because those board procedures do not apply "[w]hen the Secretary orders a reduction in force."  14 U.S.C. § 357(j).  The Secretary invoked authority conferred by 14 U.S.C. § 357(j) and authorized the Coast Guard to conduct the 2012, 2013, and 2014 CRSPs to reduce the size of the retirement eligible enlisted workforce.  Pursuant to that statutory authority and written authorization by the Secretary, the Coast Guard involuntarily retired a total of 400 retirement eligible enlisted members, including plaintiffs, as a result of the 2012, 2013, and 2014 CRSPs.  Plaintiffs argue that their involuntary retirements were unlawful because the Coast Guard did not use the enlisted personnel board procedures.

## STATEMENT OF FACTS

"Pursuant to statutory authority, 14 U.S.C. § 357(j), the Secretary of [the Department of] Homeland Security ordered reductions in force in 2010, 2011, 2012, 2013, and 2014, to be carried out through . . . CRSPs . . . to reduce the size of the retirement eligible enlisted workforce and increase opportunities for accessions and advancements among the remaining enlisted

---

[2] In 2016, Congress repealed the provisions of 14 U.S.C. § 357 (2012).  Coast Guard Authorization Act of 2016, Pub. L. 114-120, § 215, 130 Stat. 45 (2016).  All citations to section 357 in this brief refer to the 2012 edition of title 14, United States Code.

service members in all grades." DA4, Def. Sworn Interrogatory Answers ¶ 3(a) (citing DA17-18, AR 27-28; DA32-33, AR 53-54; DA47-48, AR 86-87, DA53-54, AR 128-29). "Each of the . . . CRSPs was governed by a precept, which set forth policies and procedures that governed those particular reductions in force." *Id.* ¶ 3(b) (citing DA19-31, AR 36-48; DA34-46, AR 69-81; DA49-52, AR 114-17; DA55-58, AR 139-42). At the time, "there were no Coast Guard regulations, policies, or procedures in existence that otherwise would have governed all reductions in force generally or these CRSPs in particular." *Id.* Plaintiffs do not allege any violation of the CRSP procedures established in the precepts and do not allege any violation of a Coast Guard regulation.

"CRSPs were one of several workforce management tools (also known as workforce shaping or workforce flow tools) that the Coast Guard used during the 2010 through 2014 timeframe." DA6, Def. Sworn Interrogatory Answers ¶ 5(a). "As a workforce management tool, CRSPs reduced the size of the retirement eligible enlisted workforce and increased opportunities for accessions and advancements among the remaining enlisted service members in all grades." *Id.* "CRSPs also improved the flow within the enlisted workforce structure from entrance to exit as measured by retention rates, loss rates, time in service and time in grade." *Id.* "By improving enlisted workforce flow, CRSPs enabled advancement opportunities for high performing junior enlisted personnel." *Id.* "Other workforce management tools that the Coast Guard used during this same time period included reduced accessions (new enlistments), reactivation of high year tenure, ending indefinite reenlistments, updating reenlistment standards, and early retirement and voluntary separation programs." DA8, Def. Sworn Interrogatory Answers ¶ 6(d).

At the time of the CRSPs, the Coast Guard also was reducing the total numbers of enlisted billets (positions) and enlisted service members (people). DA7-8, Def. Sworn

Interrogatory Answers ¶¶ 6(a), 6(b), 6(c).  For example, "from the end of fiscal year 2009 through the end of fiscal year 2015, there was a reduction of 1,560 enlisted *billets*, and the vast majority of the enlisted billets that were eliminated were in the grades of E-1, E-2, E-5, and E-6." *Id.* ¶ 6(b) (emphasis supplied).  Likewise, "there was a reduction of 3,410 enlisted *service members* from the end of fiscal year 2009 through the end of fiscal year 2015, and the vast majority of these reductions consisted of enlisted service members in the grades of E-3, E-4, E-5, and E-6."  *Id.* ¶ 6(c) (emphasis supplied).  These reductions were the product of "the Coast Guard's contemporaneous judgment regarding the number of billets that the agency could afford to maintain and authorize at the time in light of current and anticipated budget constraints and competing funding priorities."  *Id.* ¶ 6(b).  "At the end of fiscal year 2009, the number of actual enlisted service members (34,103) was 553 higher than the authorized number of enlisted billets (33,550)."  *Id.* ¶ 6(e).  "At the end of fiscal year 2014, the number of actual enlisted service members (31,126) had dropped to more than 1,000 below the authorized number of enlisted billets (32,368)."  DA9, Def. Sworn Interrogatory Answers ¶ 6(g).  "Following the end of fiscal year 2014, the Coast Guard decided that it was not necessary to hold another CRSP in 2015."  *Id.* ¶ 6(h) (citing DA59-60, AR 164-65).

"The Coast Guard generally did not eliminate the billets that were occupied by the enlisted service members in higher grades (E-7 and above) who were selected for involuntary retirement during the 2010, 2011, 2012, 2013, and 2014 CRSPs."  DA9, Def. Sworn Interrogatory Answers ¶ 6(i).  "This is because the Coast Guard not only had a goal of reducing the overall size of the entire workforce, but also had a goal of rebalancing the workforce to ensure opportunities for continued accessions and advancements, which were essential for the Coast Guard to maintain a healthy enlisted workforce."  *Id.*  "To achieve these twin goals during

the period from the end of fiscal year 2009 through the end of fiscal year 2015, the Coast Guard required a combination of (i) reduced numbers of enlisted service members in certain of the lower grades (E-6 and below), (ii) reduced numbers of enlisted billets in certain of the lower grades (E-6 and below), (iii) reduced numbers of retirement eligible enlisted service members and increased turnover in higher grades (E-7 and above), and (iv) stable numbers of enlisted billets in higher grades (E-7 and above)." *Id.* "For example, the increased turnover associated with involuntary retirements of enlisted service members in higher grades (E-7 and above), while maintaining those higher graded billets, reduced the size of the retirement eligible enlisted workforce and increased opportunities for accessions and advancements among the remaining enlisted service members in all grades." *Id.* "Likewise, reducing the number of enlisted service members in certain of the lower grades (E-6 and below), while also reducing the number of enlisted billets in certain of those lower grades, reduced the overall size of the workforce and increased opportunities for accessions and advancements by remaining enlisted service members in those lower grades." DA9-10, Def. Sworn Interrogatory Answers ¶ 6(i).

The Secretary's memoranda authorizing the 2012, 2013, and 2014 CRSPs are identical in relevant part. [3] DA32-33, AR 53-54; DA47-48, AR 86-87; DA53-54, AR 128-29. In each authorization, the Secretary "determined that holding another [CRSP] panel . . . is in the best interest of the Coast Guard." DA32, AR 53; DA47, AR 86; DA53, AR 128. The Secretary explained that each "CRSP is designed to strategically rebalance the enlisted force toward a more upwardly mobile, performance based demographic," because "[r]elatively stagnant military end-

---

[3] Secretary Janet A. Napolitano signed the 2012 and 2013 CRSP memoranda. DA33, AR 54; DA48, AR 87. Secretary Jeh H. Johnson signed the 2014 CRSP memorandum. DA54, AR 129. For ease of reference in this brief, we refer to Secretaries Napolitano and Johnson collectively as "the Secretary."

strength and lower than normal attrition rates continue to result in lower than normal accession forecasts," and "[t]hese dynamics jeopardize the future military workforce of the Coast Guard by slowing the advancement of the Coast Guard's most high performing enlisted members." *Id.* The Secretary elaborated that "[t]hose [enlisted members] not selected for continued service will be involuntarily retired," and "[m]embers identified for involuntary retirement will be entitled to full retirement benefits." *Id.*

The Secretary's authorization memoranda also discuss the legal authority for the CRSPs. DA32, AR 53; DA47, AR 86; DA53, AR 128. In each memo, the Secretary determined that "[t]he legal authority to conduct a CRSP panel derives from title 10, U.S. Code Section 1169 and title 14, U.S. Code Section 357(j)." *Id.* The Secretary explained that, (1) "[u]nder Section 1169, regular enlisted members of an armed force may be discharged, before service term expiration, as the Secretary concerned may prescribe," and (2) "[u]nder Section 357(j), the Secretary . . . may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a 'reduction in force.'" *Id.*

The Secretary's authorization memoranda also separately address how the "reduction of force" pursuant to section 357(j) would be communicated to the fleet, which includes both enlisted and civilian workforces. DA32, AR 53; DA47, AR 86; DA53, AR 128. In each authorization, the Secretary stated: "[i]n order to avoid creating confusion in the fleet, the CRSP process does not include the term 'reduction in force,' which has specific meanings in other statutory contexts" that may apply to civilian employees, whereas, "title 14 does not define, directly or by reference, [a] 'reduction in force'" for enlisted service members. *Id.* The Secretary reiterated that, notwithstanding how it was to be communicated to the fleet, a legal review "determined [that the CRSP process] complies with applicable laws and regulations." *Id.*

Finally, the Secretary described an ongoing legislative effort to make the CRSP process more efficient by delegating to the Coast Guard permanent authority to conduct reductions in force using CRSPs without the need for approval by the Secretary. DA33, AR 54. Specifically, the Secretary stated that the Coast Guard was "in the process of submitting a Legislative Change Proposal (LCP) granting the Coast Guard permanent authority to hold this [CRSP] panel as needed," but, "since the LCP approval may take several years," the Secretary granted the Coast Guard approvals "while awaiting [the Coast Guard's own] permanent authority." *Id.*; *see also* DA47-48, AR 86-87; DA54, AR 129. The Coast Guard's LCP came to fruition in 2016, when Congress repealed the relevant provisions of section 357. Coast Guard Authorization Act of 2016, Pub. L. 114-120, § 215, 130 Stat. 45 (2016).

## SUMMARY OF THE ARGUMENT

The United States is entitled to summary judgment because the Secretary exercised lawful discretion to conduct reductions in force through the CRSPs at the Coast Guard in 2012, 2013, and 2014. There is no dispute that the Secretary possessed authority to involuntarily retire enlisted members pursuant to CRSPs, as this Court previously held in *Lippmann v. United States*, 127 Fed. Cl. 238, 250-51 (2016). There also is no dispute that military components possess lawful discretion to make targeted reductions in particular grades to ensure proper functioning of the military workforce, as the Federal Circuit held in *Allphin v. United States*, 758 F.3d 1336, 1341-42 (Fed. Cir. 2014). The Coast Guard was not required to use the enlisted personnel board procedures set forth in section 357(a)-(h) before involuntarily retiring 400 service members, including plaintiffs, because the Secretary ordered a reduction in force pursuant to section 357(j), which renders those board procedures inapplicable by operation of law.

Congress did not establish any legal limitation upon the broad discretion of the Secretary to use section 357(j) authority to conduct a reduction in force at the Coast Guard without regard for the enlisted personnel board procedures in section 357(a)-(h) that otherwise would be applicable to retirement eligible enlisted members. The ordinary meaning of a reduction in force may refer to a reduction in personnel, a reduction in positions, either, or both. Lest there be any doubt, because section 357(j) did not define, and the legislative history does not elaborate upon, what constitutes a "reduction in force," Congress implicitly delegated any questions about the nature and scope of that authority to the Secretary's sound discretion, and the Secretary's reasonable interpretation of section 357(j) is entitled to *Chevron* deference. *See* Order at 2, July 2, 2019, ECF No. 22 ("It appears to the Court that the appropriate legal standard is governed by the decision in *Chevron*").

Nevertheless, plaintiffs argue that a reduction in force must be directed only to positions and not to people, such that they contend the Coast Guard did not conduct a reduction in force when it reduced the number of retirement eligible enlisted members without eliminating the billets (or positions) that they occupied. There is no statutory support for this argument. To the extent the Court may find any ambiguity in the plain language of the statute, *Chevron* requires that the Court defer to the agency's reasonable interpretation of the statute. Plaintiffs also rely upon cases from the civilian sphere (title 5, United States Code), where a detailed web of statutory and regulatory provisions govern civilian reductions in force. Those underlying provisions at issue in plaintiffs' civilian cases are inapplicable to enlisted members serving on active duty in the Coast Guard and do not support plaintiffs' arguments in any event. Plaintiffs also misconstrue a few snippets of unsworn documents that were drafted in whole or in part by Captain Calhoun, who did not exercise any decision making authority relative to the CRSPs and

only discussed communications strategy in the statements cited. Accordingly, plaintiffs'

arguments in this case are unsupported as a matter of law and fact.

ARGUMENT

I.    <u>The Statutory Scheme Broadly Authorizes, But Does Not Define, Reductions In Force</u>

The Secretary's memoranda regarding the 2012, 2013, and 2014 CRSPs invoked statutory

authority in 10 U.S.C. § 1169 and 14 U.S.C. § 357(j). DA32, AR 53; DA47, AR 86; DA53, AR

128. Section 1169 provides: "No regular enlisted member of an armed force may be discharged

before his term of service expires, except (1) as prescribed by the Secretary concerned; (2) by

sentence of a general or special court martial; or (3) as otherwise provided by law. 10 U.S.C.

§ 1169; *see also* 10 U.S.C. § 101(a)(4) ("The term 'armed forces' means the . . . Coast Guard.").

As this Court previously held, section 1169 confers upon the Secretary authority to retire enlisted

members of the Coast Guard pursuant to CRSPs. *Lippmann*, 127 Fed. Cl. at 250-51. Moreover,

it is well-established that section 1169 confers upon the Secretaries of military components

authority to make targeted reductions within particular grades to ensure proper functioning of the

military workforce. *Allphin*, 758 F.3d at 1342. The Secretary's contemporaneous rationale in

this case – reducing the number of retirement eligible enlisted members to ensure proper

functioning of the workforce – is substantively identical to the Navy's reason for personnel

reductions that were sustained by the Federal Circuit in *Allphin*. Plaintiffs' only challenge in this

case is whether section 357 required the Coast Guard to follow enlisted personnel board

procedures prior to ordering their involuntary retirements.

Congress enacted section 357 in 1991. Coast Guard Authorization Act of 1991, Pub. L.

102-241, §6(a), 105 Stat. 2211 (1991). Section 357(a)-(h) established requirements for "enlisted

personnel boards" and mandatory procedures for the Coast Guard to involuntarily retire enlisted

- 9 -

members.  14 U.S.C. § 357(a)-(h).  For example, enlisted members with retirement eligibility generally were entitled to board review and had a right to appeal.  *Id.*  However, Congress created an exception in section 357(j) providing that, "when the Secretary[4] order[ed] a reduction in force, enlisted personnel may be involuntarily separated from the service without the [b]oard's action."  *Id.* § 357(j).

Congress did not define the phrase, "reduction in force," in section 357(j).  *See id.* Likewise, there is no discussion of what constitutes a "reduction in force" in the legislative history of section 357.  S. REP. NO. 102-169, at 9 (1991) ("These [board review] procedures [in section 357] would not be required during mandated reductions in force."); H.R. REP. NO. 102-132, at 29 (1991) ("When the Secretary orders a reduction in force, enlisted personnel may be involuntarily retired without [b]oard action.").  Thus, Congress implicitly delegated any questions about the scope of that authority to the Secretary's sound discretion.  *See* 14 U.S.C. § 501(h) ("For the purpose of executing the duties and functions of the Coast Guard the Secretary may . . . do any and all things necessary to carry out the purposes of this title."); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, *Inc.*, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit."); *Meyers v. United States*, 96 Fed. Cl. 34, 53 (2010) ("[A] statute's ambiguity constitutes an implicit delegation from Congress to the

---

[4] From 1991 through 2003, the Coast Guard was a component of the Department of Transportation (DOT), and the Secretary of DOT possessed the reduction in force authority set forth in section 357(j).  In 2003, the Coast Guard became a component of the Department of Homeland Security (DHS), and then the Secretary of DHS possessed that authority.

agency to fill in the statutory gaps.") (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

II.    The Secretary's Interpretation Of Section 357(j) Is Consistent With The Plain Meaning And Otherwise Is Entitled To *Chevron* Deference

In reviewing an agency's construction of a statute that it administers, courts are guided by the two-step analysis in *Chevron*, 467 U.S. 837 (1984).  *See* Order at 2, July 2, 2019, ECF No. 22 ("It appears to the Court that the appropriate legal standard is governed by the decision in *Chevron*").  In the first step, courts determine "whether Congress has directly spoken to the precise question at issue."  *Hymas v. United States*, 810 F.3d 1312, 1318 (Fed. Cir. 2016) (quoting *Chevron*, 467 U.S. at 842-43).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Corus Staal BV v. United States*, 395 F.3d 1343, 1346 (Fed. Cir. 2005) (same).  "If the statute is silent or ambiguous with respect to the specific issue," however, the second step is to determine "whether the agency's answer is based on a permissible construction of the statute."  *Id.* (quoting *Chevron*, 467 U.S. at 843); *accord United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous"); *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) ("[a]ny reasonable construction of the statute is a permissible construction").

Applying the *Chevron* framework, the Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute."  *Hymas*, 810 F.3d at 1324 (quoting *Suramerica de Aleaciones Laminades, C.A. v. United States*, 966 F.2d 660, 665 (Fed. Cir. 1992)).  "Courts should exercise caution before determining that any such

decisions go beyond the policy making realm that rests within the agency's purview." *Hymas*, 810 F.3d at 1329 (citing *Suramerica de Aleaciones Laminades*, 966 F.2d at 655)).

A.      The Secretary's Interpretation Of Section 357(j) Should Be Sustained Based Upon The Plain Meaning Under *Chevron* Step One

For purposes of *Chevron* step one, the statutory scheme indicates that Congress intended for the term, "reduction in force," in section 357(j) to have a flexible meaning depending upon the circumstances, because the legislature did not define that term anywhere in title 14 of the United States Code. *See* 14 U.S.C. § 357(j); *see also Cross v. Dep't of Transp.*, 127 F.3d 1443, 1447 (Fed. Cir. 1997) ("Congress has not specified the circumstances under which [reductions in force] may be appropriate"). In light of this flexibility, as discussed below, it is clear that a reduction in force may involve a reduction in personnel, a reduction in positions, either, or both.

The most natural meaning of reduction in force refers to a reduction in personnel because it is the people, and not positions, that are the force that moves an organization forward. *See* Merriam-Webster's Collegiate Dictionary 489 (11th ed. 2005) (defining "force" as "a body of persons" that are "available for a particular end" when used in the context of a "labor force"). Indeed, in the past, Congress has used the terms "reduction in personnel" and "reduction in force" interchangeably. *Compare* 5 U.S.C. § 861(a) (1964) (using the term "reduction in personnel"), *with* 5 U.S.C. § 3502(a) (1970) (using the term "reduction in force"); *see also* Act of Sept. 6, 1966, Pub. L. 89-554, § 1, 80 Stat. 428 (1966) (substituting the term "reduction in force" for "reduction in personnel" in the re-codification of laws related to civilian Federal employees in new title 5, United States Code); H.R. Rep. No. 89-901, at 1 (1965) ("The purpose of this bill is to restate in comprehensive form, without substantive change, the statutes in effect before July 1, 1965, that relate to Government employees, the organization and powers of Federal agencies generally, and administrative procedure, and to enact title 5 of the United States Code."); S. Rep.

No. 89-1380, at 18 (1966) (same); H.R. Rep. No. 89-901, at 55 (1965) ("the words 'reduction in

force' are substituted for 'reduction in personnel'"); S. Rep. No. 89-1380, at 74 (1966) (same).

A reduction in force frequently may involve a reduction in personnel and a reduction in

positions due to funding constraints. *See*, *.e.g.*, *Cross*, 127 F.3d at 1447-48 (sustaining reduction

in force that resulted in the termination of employees and elimination of their positions).  In other

circumstances, however, a reduction in force may involve a reduction in positions without a

reduction in personnel, if, for example, the personnel do not separate from the agency and

instead are reassigned to new positions as part of a reorganization.  *See*, *e.g.*, *Welch v. Dep't of

Army*, 323 F.3d 1042, 1045-46 (Fed. Cir. 2003) (sustaining "the reduction-in-force that resulted

in Welch's reassignment to a GS-12 position" after his "GS-13 position had been eliminated,"

explaining:  "Although a reduction-in-force frequently involves a reduction in the number of

employees, it need not do so.").  In still other circumstances, a reduction in force may involve a

reduction in personnel without a reduction in positions, if, for example, an agency furloughs

personnel, or, as in this case, the military needs to ensure the proper functioning of the workforce

by reducing personnel without reducing positions at a particular level.  *See*, *.e.g.*, *Nat'l

Federation of Fed. Employees, Local 1442 v. Dep't of the Army*, 810 F.3d 1272, 1282 (Fed. Cir.

2015) (sustaining reduction in force that resulted in furloughs of civilian employees); *see also

Allphin*, 758 F.3d at 1341 (stating, *in dicta*, that the Court would not review the merits of the

Navy's decision to reduce personnel in overmanned ratings to optimize the workforce, but even

if the Court were to do so, the Navy's reason would constitute sufficient cause).

Nothing in the statutory text suggests that Congress intended for a reduction in force to

narrowly encompass just one or some, rather than any, of these potential circumstances.  *See

Cross*, 127 F.3d at 1447 ("Congress has not specified the circumstances under which [reductions

in force] may be appropriate").  Accordingly, Congress did not establish any "test or standard" that would constrain the Secretary's exercise of military discretion under any of these potential circumstances.  *See Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993) ("We have emphasized that judicial review is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct.  Unless such a test or standard is provided, courts must abstain.") (quoting *Sargisson v. United States*, 913 F.2d 918, 922 (Fed. Cir. 1990); *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988)).  The more narrow construction urged by the plaintiffs also could have consequences that Congress never intended, such as depriving employees of their rights if they are separated or furloughed without an elimination of their vacant position as part of a reduction in force.  *See* 5 U.S.C. § 3502; *see also* 5 C.F.R. §§ 351.201, 351.901.  Thus, it is clear that a reduction in force may be a reduction in personnel, a reduction in positions, either, or both.

B.    Even If Section 357(j) Is Ambiguous, The Secretary's Reasonable Interpretation Is Entitled To Deference Under *Chevron* Step Two

In the alternative, given the absence of any statutory definition or legislative history, the Court may reasonably conclude that section 357(j) did not speak to the precise question in this case for purposes of *Chevron* step two.  Namely, the Court may conclude that Congress did not precisely indicate whether a reduction in the number of retirement eligible enlisted members (people) may constitute a reduction in force for purposes of section 357(j) without an elimination of the billets (positions) that were occupied by those enlisted members.  *See Cross*, 127 F.3d at 1447 ("Congress has not specified the circumstances under which [reductions in force] may be appropriate").  The Secretary answered this question in the affirmative, reasonably interpreting the "reduction in force" term in section 357(j) as "legal authority to conduct a CRSP panel" to effectuate "involuntary retirements without action by Enlisted Personnel Boards."  DA32, AR

53; DA47, AR 86; DA53, AR 128.  The Secretary's interpretation is consistent with the statutory scheme, which did not define "reduction in force" in terms of particular circumstances, and, instead, allowed for a flexible meaning.  The Secretary's interpretation also is reasonable because it construes "reduction in force" as a reduction in personnel, which is consistent with the most natural reading of the term in this context.  *See* Merriam-Webster's Collegiate Dictionary 489 (11th ed. 2005) (defining "force" as "a body of persons" that are "available for a particular end" when used in the context of a "labor force").

Mindful that the Coast Guard fleet has separate military and civilian workforces, the Secretary also recognized a distinction between the legal frameworks governing reductions in force in military and civilian spheres.  *Id.*  Specifically, the Secretary explained that, whereas "the term 'reduction in force' . . . has specific meanings in other [non-military] statutory contexts," in contrast, "title 14 does not define, directly or by reference, [the term] 'reduction in force.'"  *Id.*  Indeed, in the civilian sphere, there is a detailed web of statutes and regulations governing reductions in force, which do not apply to the military.  *See*, *e.g.*, 5 U.S.C. §§ 3501(b), 3502, 3595, 5361(7), 5362, 7512; 5 C.F.R. part 351.  And in the civilian sphere, reductions in force commonly involve a reduction of personnel and positions.  But, there is no statute, regulation, or rule, providing that *all* reductions in force must involve a reduction in positions.

In contrast, regulations promulgated by the Office of Personnel Management expressly contemplate targeted "reductions in force in [an] employee's competitive area" while agencies may maintain "vacant position[s]."  *See* 5 C.F.R. § 351.201(a)(2) ("Each agency shall follow this part when it releases a competing employee from his or her competitive level by furlough for more than 30 days, separation, demotion, or reassignment requiring displacement, when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling;

reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties when such action will take effect after an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days."); 5 C.F.R. § 351.201(b) ("This part does not require an agency to fill a vacant position.  However, when an agency, at its discretion, chooses to fill a vacancy by an employee who has been reached for release from a competitive level for one of the reasons in paragraph (a)(2) of this section, this part shall be followed.").  These statutes and regulations from the civilian sphere do not apply to enlisted members of the military, but they illuminate the unreasonableness and impracticality of plaintiffs' proposed construction of the term "reduction in force."

      C.      The Repeal Of Section 357 By Congress Further Supports The Reasonableness Of The Secretary's Interpretation

In late 2011, the Secretary described an ongoing legislative effort to make the CRSP process more efficient by delegating to the Coast Guard permanent authority to conduct reductions in force using CRSPs without the need for approval by the Secretary.  DA33, AR 54; *see also* DA47-48, AR 86-87; DA54, AR 129.  In 2016, Congress granted the Coast Guard's wish by repealing the enlisted personnel board procedures in section 357(a)-(h) along with the reduction in force exception in section 357(j).  Coast Guard Authorization Act of 2016, Pub. L. 114-120, § 215, 130 Stat. 45 (2016).  The Senate Committee on Commerce, Science, and Transportation (Senate Committee) explained that this repeal "would ensure that [Coast Guard] enlisted members are treated in a manner similar to enlisted personnel of the other military services," and would "enable the [Coast Guard] to more efficiently conduct career retention screening panels during reductions in force or performance-based senior enlisted continuation boards common to the other military services, specifically the Department of the Navy."  S. REP.

- 16 -

No. 114-168, at 13 (2015).  When the Senate Committee stated that the repeal of 357(j) would "enable the [Coast Guard] to *more efficiently* conduct [CRSPs] during reductions in force," the phrase "more efficiently" suggests that CRSPs were already a proper vehicle for carrying out reductions in force, and repealing the relevant sections of section 357 simply would allow the Coast Guard to use CRSPs "more efficiently."  *Id.* (emphasis added).  Although this legislative history from the 114th Congress is not evidence of the intent of the 102nd Congress that enacted section 357 back in 1991,[5] Congressional support for the use of CRSPs to effectuate reductions in force by the Coast Guard lends further support to the reasonableness of the Secretary's interpretation for purposes of *Chevron* step two in this case.  *C.f. Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001) ("subsequent [legislative] history is less illuminating than the contemporaneous evidence.").

III.    Plaintiffs' Remaining Arguments Are Without Merit

Plaintiffs argue that "a reduction in force necessarily implicates the elimination of positions, not individuals."  Pls. Mot. for S.J. at 13-14.  As demonstrated above, this argument is untethered to the statutory and regulatory scheme and the plain meaning of the statute.

Plaintiffs also cite to the *Huber* line of Federal Circuit decisions in Merit Systems Protection Board (MSPB) appeals that include language indicating that a reduction in force involves a reduction in positions rather than an adverse personnel action directed at a particular employee.  *Id.* (citing *Welch*, 323 F.3d at 1046 (quoting *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) (citing *Huber v. Merit Sys. Prot. Bd.*, 793 F.2d 284, 286 (1986)))).  This proposition does not support plaintiffs' argument.

---

[5] As noted above in the text, there is no discussion of what constitutes a "reduction in force" in the legislative history of section 357 from the 102nd Congress.

In the *Huber* line of cases, each employee's civilian position had been abolished pursuant to a reduction in force. *Welch*, 323 F.3d at 1044; *James*, 284 F.3d at 1313; *Huber*, 793 F.2d at 285; *see also Gandola v. Fed. Trade Comm'n*, 773 F.2d 308, 310 (Fed. Cir. 1985). In the context of resolving cases involving civilian positions that were eliminated, the Federal Circuit described reductions in force as an "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *Welch*, 323 F.3d at 1046; *James*, 284 F.3d at 1314; *accord Huber*, 793 F.2d at 286. But, in these cases, the Federal Circuit did not consider, much less decide, whether a reduction in force also may be an administrative procedure by which agencies may reduce personnel without reducing positions.

Instead, the Federal Circuit had to consider in the *Huber* line of cases whether the MSPB possessed jurisdiction to entertain the appeals in light of 5 U.S.C. §§ 7512 and 7513(d), which grant civilian employees a right to appeal to the MSPB in cases involving enumerated adverse personnel actions (removal, suspension for more than 14 days, reductions in pay or grade, and furlough for 30 days or less), but there is no right to appeal in such cases involving a reduction in force pursuant to 5 U.S.C. § 3502. In contrast, the MSPB possesses jurisdiction to entertain appeals by "an employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action." 5 C.F.R. § 351.901. Against this backdrop, the Federal Circuit described a reduction in force "not [as] an adverse personnel action against a particular employee" (such as a removal under 5 U.S.C. § 7512), but instead, as an action "directed solely at a [civilian] position within an agency" (such as a separation due to abolishment of a position in a reduction in force action under 5 C.F.R. § 351.901). *Welch*, 323 F.3d at 1046; *James*, 284 F.3d at 1314; *Huber*, 793 F.2d at 286. In sum, the Federal Circuit was just describing reductions in force in the context of what was at issue in those MSPB cases.

*Huber* also recognized that, under different circumstances, a reduction in force may involve a reduction of personnel without a reduction in positions. Specifically, the Federal Circuit stated that furloughs are covered by OPM's reduction in force regulations under 5 C.F.R. § 351.201, *Huber*, 793 F.2d at 286-87, and furloughs do not involve the elimination of a position. *See* 5 U.S.C. § 7511(a)(5) ("'furlough' means the placing of an employee in a temporary status without duties and pay because of lack of work or funds or other nondisciplinary reasons"); *see also Wolf v. Dep't of Vet. Affairs*, 317 F.3d 1395, 1396 (Fed. Cir. 2003) ("An agency is required to use [reduction in force] procedures when it releases a competing employee from his or her competitive level by either furlough of more than thirty days, separation, demotion, or reassignment requiring displacement when the release is required due to reorganization."). But, regardless, the *Huber* line of cases is readily distinguishable because they do not interpret section 357(j), interpret any statute or regulation applicable to the military, or apply the *Chevron* framework. *See* Order at 2, July 2, 2019, ECF No. 22 ("It appears to the Court that the appropriate legal standard is governed by the decision in *Chevron*").

Next, plaintiffs cite to 5 U.S.C. § 3595(d), which does not support their argument that reductions in force pertain only to reductions in positions, and not personnel. Pls. Mot. for S.J. at 14 n.5. Section 3595 provides: "For purposes of this section, 'reduction in force' includes the elimination or modification of a position due to a reorganization, due to a lack of funds or curtailment of work, or due to any other factor." 5 U.S.C. § 3595(d). Section 3595 applies "[f]or the purposes of th[at] section," which, in turn, pertains to removals "from the Senior Executive Service [SES] in any reduction in force of career appointees within that agency." *Id.* § 3595(a). Thus, section 3595 does not apply to all civilian employees or to any military personnel. *See id.* In any event, section 3595 does not provide an exclusive definition of "reduction in force" for

SES employees, and, instead, it provides a nonexclusive statement of what a "reduction in force" "includes." *Id.* § 3595(d). Even if the Court were to accept plaintiffs' incorrect reading of section 3595 as providing a definition of reduction in force that exclusively pertains to reductions in positions, that still would cut against plaintiffs' argument, because Congress chose not to make that definition applicable to non-SES civilian employees or to military personnel. *Id.* § 3595(a).

Plaintiffs stretch even further relying upon cases from other jurisdictions that did not involve the United States as a party, did not construe any statute that governs either uniformed service members or Federal civilian employees, and did not conduct any statutory analysis under the *Chevron* framework. Pls. Mot. for S.J. at 14-15 (citing *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *Sanders v. Kohler Co.*, 641 F.3d 290, 294 (8th Cir. 2011)). These inapposite cases require no further discussion.

Next, plaintiffs argue, correctly, that the CRSPs were not motivated by an intention to reduce billets (positions) or other potential reasons, which are not being asserted by the Coast Guard. Pls. Mot. for S.J. at 15-16. But, plaintiffs overlook the actual reason for CRSPs; namely, "rebalancing the workforce to ensure opportunities for continued accessions and advancements, which were essential for the Coast Guard to maintain a healthy enlisted workforce." DA9, Def. Sworn Interrogatory Answers ¶ 6(i). During the same timeframe, the Coast Guard also "had a goal of reducing the overall size of the entire workforce." *Id.* "To achieve these twin goals during the [relevant] period . . . , the Coast Guard required a combination of (i) reduced numbers of enlisted service members in certain of the lower grades (E-6 and below), (ii) reduced numbers of enlisted billets in certain of the lower grades (E-6 and below), (iii) reduced numbers of retirement eligible enlisted service members and increased turnover in higher grades (E-7 and above), and (iv) stable numbers of enlisted billets in higher grades (E-7 and above)." *Id.*

Plaintiffs also overlook that "the increased turnover associated with involuntary retirements of enlisted service members in higher grades (E-7 and above) [through the CRSPs], while maintaining those higher graded billets, reduced the size of the retirement eligible enlisted workforce and increased opportunities for accessions and advancements among the remaining enlisted service members in all grades." *Id.* Indeed, as the Secretary explained, each "CRSP [wa]s designed to strategically rebalance the enlisted force toward a more upwardly mobile, performance based demographic," because "[r]elatively stagnant military end-strength and lower than normal attrition rates continue to result in lower than normal accession forecasts," and "[t]hese dynamics jeopardize the future military workforce of the Coast Guard by slowing the advancement of the Coast Guard's most high performing enlisted members." DA32, AR 54; DA47, AR 86; DA53, AR 128. It is manifest that the Coast Guard had a legitimate reason for conducting the CRSPs to ensure a healthy enlisted workforce. But, the merits of these military staffing decisions are "nonjusticiable" and judicial review is limited to whether the law was followed. *See Allphin*, 758 F.3d at 1341-42 ("The merits of a military staffing decision are committed wholly to the discretion of the military.") (internal quotation marks, citation omitted).

Finally, plaintiffs assert that "the CRSPs were never contemporaneously understood or described by the Coast Guard – internally or externally – as a reduction in force." Pls. Mot. for S.J. at 16-17. Likewise, plaintiffs assert that "the first time the Defendant described CRSPs as a reduction in force was when the legality of involuntary retirements was challenged in this Court." *Id.* Plaintiffs' assertions are belied by the record.

Specifically, the Secretary's contemporaneous memoranda – signed in December 2011, December 2012, and March 2014 – each discuss the CRSPs as a reduction in force long before this litigation commenced. DA32, AR 53; DA47, AR 86; DA53, AR 128. In each memo, the

Secretary determined that "[t]he legal authority to conduct a CRSP panel derives from title 10, U.S. Code Section 1169 and title 14, U.S. Code Section 357(j)." *Id.* The Secretary explained that, (1) "[u]nder Section 1169, regular enlisted members of an armed force may be discharged, before service term expiration, as the Secretary concerned may prescribe," and (2) "[u]nder Section 357(j), the Secretary . . . may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a 'reduction in force.'" *Id.* These memoranda that refer specifically to "reduction in force" authority for the CRSPs were drafted by Admiral R.J. Papp, Jr., Commandant of the Coast Guard, who was the highest ranking officer in the entire Coast Guard at the time. *Id.* Therefore, both the Secretary and the Coast Guard contemporaneously understood and described each CRSP as a lawful reduction in force under section 357(j). *Id.*

However, plaintiffs' contention is accurate in one respect. The Secretary decided not to have the Coast Guard describe the CRSPs as a reduction in force to the fleet, which was comprised of both civilian and military workforces, to avoid confusion because the CRSPs were not being conducted pursuant to the statutes and regulations that govern reductions in force for civilian employees. *See* DA32, AR 53; DA47, AR 86; DA53, AR 128. Plaintiffs do not (and cannot) cite to any statute, regulation, or rule that would have required the Coast Guard to publicly communicate the words "reduction in force" when conducting a reduction in force through the CRSPs, and the Coast Guard has articulated a rational reason for not doing so in this situation. *Id.*

Plaintiffs also misconstrue a few snippets of unsworn documents from 2010 that were drafted in whole or in part by Captain Calhoun long before the 2012, 2013, and 2014 CRSPs at issue in this case. Pls. Mot. for S.J. at 7, 16 & Exs. 9-11, 14. Captain Calhoun's sworn declaration establishes that (1) he did not exercise any decision making authority regarding the

2010 and 2011 CRSPs; (2) he had no involvement whatsoever with the 2012, 2013, and 2014 CRSPs; (3) the prior statements cited by plaintiffs in two emails and answers to frequently asked questions, all pertained to communication strategy and not legal authority for the 2010 CRSP; (4) his intent in drafting the prior statements cited by plaintiffs was to communicate that the 2010 CRSP would not involve reduction in the overall size of the workforce because it was designed to achieve a targeted reduction in the number of retirement eligible enlisted members on active duty; (5) he never intended to suggest in the prior statements cited by plaintiffs that the 2010 CRSP was not a reduction in force under section 357(j); (6) he always understood that the legal authority for the 2010 and 2011 CRSPs was as a reduction in force pursuant to section 357(j); and (7) no one ever told him that the 2010 or 2011 CRSPs were not a reduction in force under section 357(j).  DA61-63, Calhoun Decl. ¶¶ 2-8.

Plaintiffs also make too much of the fact that the Secretary's memorandum authorizing the 2010 CRSP (Pls. Mot. for S.J. Ex. 7 at 8) did not use the words "reduction in force."  Pls. Mot. for S.J. at 6, 16.  Plaintiffs are not challenging the 2010 CRSP in this case (*see* Pls. Am. Compl. ¶ 6, Nov. 16, 2018, ECF No. 8), and the Secretary's memoranda authorizing the challenged 2012, 2013, and 2014 CRSPs at issue did use the words "reduction in force."  DA32, AR 53; DA47, AR 86; DA53, AR 128.

Accordingly, plaintiffs' arguments on the merits are both legally and factually flawed.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court grant summary judgment in favor of the United States and deny plaintiffs' motion for summary judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

 s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Of Counsel:                           Deputy Director

BRIAN JUDGE                            s/ Douglas G. Edelschick
Chief                                 DOUGLAS G. EDELSCHICK
                                      Senior Trial Counsel
LCDR JUSTIN R. JOLLEY                  Commercial Litigation Branch
Deputy Chief                          Civil Division
                                      United States Department of Justice
Office of Claims & Litigation         P.O. Box 480
United States Coast Guard             Ben Franklin Station
2703 Martin Luther King Jr. Ave SE    Washington, D.C. 20044
Washington, D.C.  20593-7213          Telephone: (202) 353-9303

January 29, 2021                      Attorneys for Defendant